conversation. The attorneys that are going to present oral arguments please step up to the podium and identify yourselves to the record. Good morning, your honors. Chris Evers of the office of the State of Appellate Defender for Mr. Treadwell. Yes. Margaret Smith, Assistant State Attorney on behalf of the people of the State of Illinois. Good morning, Ms. Smith. All right, each of you will have about 15 minutes to present an argument and from that, Mr. Evers, you may save some time for rebuttal. Thank you, your honors. I'd appreciate a few minutes, of course, in rebuttal. Certainly. You may proceed. Good morning, your honors, and may it please the court. Today we're asking this court to reverse Mr. Treadwell's conviction and remand his case for a new trial. And there are two primary issues, of course, that we've brought up in our briefing. The first one I want to address is that the trial court abused its discretion when it admitted a litany of strikingly different other crimes evidence on behalf of the state so we could try to prove propensity for him to commit a violent sexual attack and also essentially for reasons of intent and motive. The second issue that I'm going to turn my attention to, of course, is then that there was an error. The trial court did not allow defense counsel to get a short continuance so that he could secure the testimony of two subpoenaed witnesses that would offer critical testimony that would have impeached first the complainant in this case, T.T., and also the chief other crimes evidence. Without the opportunity to do that, he could not present his full defense as his constitutional right. Before I present, I have a question regarding the stepdaughter's case. What happened there? The stepdaughter's case, that appears to be dropped, Your Honor. There's certainly no convictions on any record for that, but that's the best I can give you for your answer. Okay. As for propensity, as is well settled, when the state seeks to admit such evidence under Section 115.7.3, the trial court is required to do a meaningful analysis of the probative value of whatever the other evidence is against the presidential value of that evidence against the defendant using the three Donahoe factors, which are certainly proximity in time of other crimes evidence to the charged offense, the similarity or dissimilarity of the other crimes evidence to the charged offense, and, of course, the catch-all of any relevant facts or circumstances. Critically, this Donahoe factor is not just a mere checklist, like a set of elements in a criminal offense where, well, it's temporally close. That's good enough. It's got some similarity. That's good enough. It has to be a spectrum analysis of looking at overall the probative versus the presidential value, including all of the other Illinois rules and laws that are built up about other crime evidence, including the Supreme Court's recognition that other crime evidence that is farther remote in time is less probable. We are reviewing it for an abuse of discretion, though, aren't we? Yes, Your Honor, that is an abuse of discretion standard for that, too. But we're almost never at your standard of review. Absolutely it is. But as our authority in Johnson points out, the trial court's decision here not to even undertake that meaningful analysis plays a large role. It had two sentences of its analysis of why it admitted this evidence. The first sentence went to the temporal proximity, saying simply that the time of four and a half to nine years falls within what case law has allowed in the past. Is there a case, though, that says that the magical words of the statutory language have to be uttered by the judge in order for us to determine whether the court abused its discretion? No, Your Honor, there's no magical words, but what Johnson talks about, there has to be a recognition of the judge that this is a meaningful analysis, not just what happened here, focusing its two sentences on why it might be minimally probative. Its broad brush of its similarity was to say that, you know, a defendant was in the home, minor girls entered the bedroom, and some touching occurred. That's the entire analysis of why this probative stuff supposedly overcame whatever the prejudicial effect was. And he allowed this under two theories, too, right? Non-statutory common law, evidence of other crimes. Yes, Your Honor, it was also intent and motive. It was also under an abuse of discretion statement. True, Your Honor, but the prejudice, what we talked about in the Huddles here, is that at trial, this was used for propensity. The words intent and motive were essentially not uttered. Intent was mentioned once by the prosecutor in closing argument, but it was all about propensity. Well, maybe you better go back to the statutory discussion then, because the statutory exception allows propensity. Absolutely, Your Honor, and that's why it was in abuse of discretion here, because their similarities were quite different here. T.T., the complaining witness, testified about a violent attack when she was 16 years old as a young adolescent woman, when Mr. Treadwell exposed his penis to her, tried to forcibly remove parts of her clothing, and then grabbed her by the throat for approximately a minute, so tight that she could make no noise, as he tried to vaginally penetrate her with his penis. That was the violent attack, that was the charged offense. The State tried to show propensity to commit a violent attack by admitting seven separate instances of other crimes of evidence, one from TM, seven from JA, that talked about a hesitantly, maybe even savagely touching of, most of the time, nine to 12-year-old young girls over the clothes. JA did testify of one incident that was under her clothes when she was approximately nine, and then she said that the last incident happened when she was 14. But these are strikingly different facts. This was a movement, was it not, from a family friend to a stepdaughter to then a natural daughter. Was it not? No, Your Honor. Well, I got the order wrong for the family friend and stepdaughter? Those were overlapping, if you will. JA testified since this first began starting in 2009. Is that the family friend? The TM was the family friend. That happened kind of in the middle when some of this was supposedly going on with JA, and then TT took place much later, and that was a daughter as well. But JA is a stepdaughter. No, JA is a stepdaughter. Okay, sorry, I misspoke. But he went from a stepdaughter and progressed up to a natural daughter. At least that's what the allegations and the... That's what the crime definitely was trying to demonstrate, Your Honor. But the point is, is that trying to demonstrate a propensity to commit violent sexual assaults with hesitant and stealthy touching of different age girls versus a woman... What was the actual charge for the natural daughter? Was it aggravated criminal sexual assault? Attempt aggravated criminal sexual assault penetration going on. Then there was the... Attempt, not an actual aggravated criminal sexual assault, but it was an attempt charge. That's what the testimony was saying, that he was trying to... That was the charge? Yes, absolutely. All right. Does it make any difference that this was a bench trial as compared to a jury trial when we're talking about other crimes? For the propensity, not really, Your Honor. But what we do know is that they considered it. Yes, judges are always considered in a bench trial to consider properly admitted evidence. And they're also considered to know the law. Absolutely, Your Honor. But since this judge admitted it, and we're arguing that he abused his discretion when he admitted the evidence, of course he considered it, and it's that consideration that is improper and shows the harm of this improperly admitted evidence there. That's why it was prejudicial, and it's not a harmful error. Is your argument really then just about the facts? Because proximity was sort of established. There was a time when he was absent in the penitentiary. But the abuse or assault, whatever you want to term it, occurred over a significant consecutive period of time, absent his time in the penitentiary. J.A.'s claim that she was touched on those seven specific times, and the other part of the error is here that she testified to hundreds of other generic incidents or numerous incidents. Did she say the word hundreds? She said numerous incidents for the first house she was in. The second house, she said daily events. And then when we moved to the third house, she said it continued going on there. So that would support your statement in the brief that there were hundreds of incidents testified. Yes, Your Honor. I'm glad you clarified that. Going on for that, because she said daily events for multiple years going on here for that. And under Section 115.7.3e, other crimes evidence, when it is admitted for propensity, needs to be shown for what's mattered here, specific instances of conduct. It happened hundreds of times, is highly damaging and harmful because, as our testimony, or not our testimony, as our authority of category talks about, when you have some specific one or two charges, and you bring in hundreds of other charges or hundreds or a lot more of these specific instances, the fact finder implies, even a judge, that this person did something wrong. And if a bad person and the weight of that other crimes evidence plays a role in the conviction on the specific charge, even when, in this case, such as in Johnson, those other crimes are strikingly different from that violent assault that she testified to. Let me ask you this. If you remove the other crimes evidence, basically then becomes what he said, she said, trial. Yeah, it's a credibility testimony between T.T. and Mr. Trayvill. Absolutely, Your Honor. That's exactly what comes down to it. And then, based on what appears to be what you've already indicated in terms of the testimony, then the state still had enough there to possibly have a conviction here. Well, we're not making a sufficient charge. You have all the evidence, the light, most favorable defense. Yes, there was sufficient evidence to establish the conviction there for that. But that also, I'm sorry, I didn't mean to interrupt. But that also brings into account why, ultimately, the continuance issue was so powerful here. Because the defense was never allowed to bring in Tanaya, T.T.'s younger sister, who would have impeached her testimony about incidents minutes, or no, seconds before supposedly this assault took place, which goes to the credibility of T.T. There was another witness, Ms. Yoko Anderson, who would have attacked the credibility of J.A. And, yes, we've taken the position none of the perpetrators should come in. But the reality is, at trial, it did. So, the defense attorney had to attack the credibility of J.A. and T.M. And so, not allowing that continuance to move forward, to get those subpoenaed witnesses, was hurtful to the defense. The defense was aware of these witnesses. Weren't they on the state's list? Was the state going to call these individuals, but then determine that they were not at the last minute? The attorney was still aware of the witnesses. And Ms. Anderson had been under subpoena for the first day and the second day of trial for that. But the critical fact here is that on the third day of trial, which was always going to be a third day of trial, the trial court acknowledged they weren't going to finish on the second day, never planned to, she was under subpoena. She had been subpoenaed four days earlier, along with her daughter, to appear and testify at that trial. She chose not to, which violated the court orders, which the trial court even recognized when he issued an arrest warrant. Well, then how were you able to show that this witness would have ever come in? And in that instance, the cases are clear that the denial of a continuance is not an abuse of discretion. Well, Your Honor, she had been subpoenaed before, and she had been in attendance on the first and second day of trial, and knew where she was. And when a witness who was subpoenaed for trial doesn't appear, the trial judge issues an arrest warrant, and that person is in tort order, arrested. I mean, they knew where she was because she had been served before by the state. And then she's brought in and then has the option of choosing to comply and testify or not. So the cases say that where the court denies a continuance, even if there had been properly subpoenaed witnesses, and there's no indication that that person is ever going to appear, that the court doesn't abuse its discretion. Your Honor, looking at the water factors that we discussed a great deal there, the diligence is part of it, but none of that discussion, I mean, if there had been some showing that she was never going to appear, but that's not the case here. She had been subpoenaed, had known how to appear beforehand, wasn't deceased, hadn't fled the state. And the judge's responsibility under Walker was to go through those factors, and it did essentially none of those. Those factors are the materiality of the witness, due diligence on the defense counsel, complexity of the case, and whether it's a bench trial or not. So weren't these both going to be impeachment on collateral matters? One, it was smoking marijuana, which the victims admitted that she did. Isn't that correct? No, Your Honor. She admitted smoking marijuana earlier in the day a long time, but expressly denied smoking in the room with her younger sister, which is the reason that you're trying to argue here. It was just an impeachment on a collateral matter. It's impeachment about her telling the truth to the fact finder during the trial, Your Honor, and why Mr. Treloar was in the room. That's directly why he was there. Whether or not she was smoking marijuana with the other sister, was it the sister? Yes, younger sister. You're saying that that's not impeachment on a collateral matter. What case would support what you just said when the witness admitted that she smoked marijuana previously with her boyfriend and that she had admitted smoking marijuana earlier that evening? Your Honor, what I've always argued now and in the briefs is the impeachment is showing that T.T. was not telling the truth. Okay, but that's not my question. I'm directing this question to whether or not she was trying to impeach a witness on what would be otherwise a collateral matter. And the court has the discretion to deny the continuance. She did state her reason. Her reason was she wanted to show that she smoked marijuana with her sister. I mean, how is that not impeachment on a collateral matter? The yelling is on the direct matter, Your Honor. The yelling? Yes, T.T. testified that after she had been held by the throat court for a period of time, she yelled and ran out of the house. Tania would have left that room approximately a minute beforehand, would have been awake, and would have been able to corroborate. As defense attorney expressed during the property of the trial, judges, that no yell was heard, even though she supposedly was very close by and awake at that period of time.  She couldn't make any noise for a while, then she broke free, yelled, and then ran out of the house. That was her testimony at trial. And where is the evidence that the sister was nearby at that point? She had left the room, both the state, T.T. and Ms. Trotha, that she had left the room just after Mr. Trotha entered. And so since this is all true- So where is there evidence that she was anywhere nearby to hear anything? She was in the house, Your Honor. That is what- And where in the house? Your Honor, that's what the property responding to the threat that we're having this conversation right now is the Supreme Court's decision not to allow subpoenaed witnesses to testify or have a short continuance at a bench trial when no state witness, because they can literally be impacted, no juror will be impacted, demonstrate that he did not go through the walk of factors and recognize that the Supreme Court itself, of our great state, recognizes that relative defense is important. What about the mother? I'm sorry? What about the mother? She will attack the credibility of J.A. who gave evidence- The test- Her offer of proof, the lawyer's offer of proof, was that the mother would say that she wasn't told about this. Correct. Wasn't told about that on- What was your strongest case to support that that type of evidence would be allowed? That she didn't tell me? The other kind of evidence was admitted to prove propensity for sexual attacks. And hacking the credibility of a state witness that is being used to demonstrate your client has committed offenses is always allowed. J.A. did not tell the truth when she told the court under oath that I told my mother about this years before supposedly Mr. Trayvill stopped doing this to me. That impeaches her credibility because it shows that she's not telling the truth. She testified that she told her mother? Yes. Okay. And her mother would say that is not true, Your Honor, under oath. And that impacts her- And I thought the issue about the subpoenas was that they were slapped on the mother, like, at the courthouse. You know, approximately one-third in the afternoon in the courthouse in a hallway outside of the courtroom there. You said they were subpoenaed multiple times or something? No, well, they were subpoenaed four days before. This took place in January, Friday, January 17th. Who subpoenaed them four days before? The defense investigator. Both of those were returned and appear in the record of how they- Okay, and that's not the same time that he said that he put it in her arm and she dropped it? He served her by giving them to her in person. That is serving them, and it's his responsibility. Did he say that she just- Yes. Because the judge brought them out on the property where the defense attorney asked for a continuance. The defense investigator was brought up, spoke to the judge on their questioning there, and that's exactly what he explained to her. Okay, was that the- Now, is that what you're basing this subpoenaing on, that before that day, defense counsel had not issued a subpoena? Yes, Your Honor, that would be the case. I thought she said, well, I was relying on the state's discovery list of witnesses, so I didn't subpoena them before the first or second or third day of trial. She did not subpoena Ms. Anderson before, and because Ms. Anderson was under subpoena for the first day of trial by the state, the trial judge extended that subpoena to the 17th the next day. That's page 36- I don't recall that in the record. Your Honor, I can tell you right now here that it appears- Is a defense attorney allowed to rely on a subpoena that the state issues? Your Honor, I've never taken the position that she could rely upon it. You asked me if she was under subpoena. Ms. Anderson was under subpoena, showed up on the first day, showed up on the second day. Defense counsel realized then that defense- she wasn't going to be called as a witness, and that's when she tried to attempt her- Right, but is there any case law that allows a defense attorney to rely on the fact that somebody else may have- the state, rather, who subpoenaed the witness for trial? We are not for- no, Your Honor, that's why- Wasn't that part of the judge's problem? That he said to the lawyer that you answered ready, you demanded trial, and now you're subpoenaing the witness during the actual proceedings? Didn't the trial judge have a problem with that? Yeah, the judge was irritated. Certainly, there's no doubt he's irritated. Is there a case law that supports that that would not be an abuse of discretion, to answer ready, demand trial, and then subpoena during trial? And the court said, I'm not going to continue this now, because you issued a subpoena after the trial started. Your Honor, I would welcome the direction of asserting a case law about that, but the idea is not just about- I mean, there is case law that suggests that the court doesn't abuse its discretion when a witness who has been subpoenaed doesn't show up because the lawyer waited too long to subpoena the witness. But, Your Honor, the witness was subpoenaed for the third day. She violated the court. It was a trial court- But what attorney should be waiting until the third day of trial to subpoena a witness? I agree. I agree. That's why it's ineffective assistance of counsel, Your Honor. I mean, that's our second alternative argument there that the whole thing changes on, because she got a subpoena in late, and therefore there's some difference between subpoenaing four days before your testimony date or four weeks. That's ineffective assistance of counsel, which also should mean that Mr. Treadwell gets a new trial, because he did not get to present his defense. All right. Now, what about the forfeiture argument that the State makes in its brief? About the continuous issue, Your Honor? Yes. We disagree, Your Honor. It's a constitutional issue. Obviously you disagree. What is your response? Under a note, and Craig, this is a constitutional issue, the right to present a full defense. That was clearly raised by the multiple, I mean, the talking back and forth during that. There was no question that the lawyer said, I'd like to present these witnesses and made an offer of proof. Yes. And it was going to the defense. So that's your position, that this was, in effect, a suggestion that I'm not going to be allowed to defend my client if I don't get these witnesses in. Correct. Yes. And under Craig, and you're saying this is a constitutional issue, that rather than have it proceed to a subsequent post-conviction issue, the court should allow it? Yes, Your Honor. All right. Okay. Yes, that's the point. And then the State, in the alternative, argued that plain error doesn't apply to me. If you restrict plain error, it does apply. We did do that in your reply. Okay. All right. This wasn't harmless. We've talked about, moved a little bit on the motive and intent purposes of why the State allowed the evidence, the State asked for the evidence, the trial court allowed it in. I'm planning, unless there's any specific questions from the judges on those motives and the intent aspects, to reserve my time and let opposing counsel have her argument and then rebut.  Thank you, Your Honor. Sure. Ms. Smith. May it please the Court. I'm Assistant State's Attorney Margaret Smith, representing the people of the State of Illinois. This case is about the judge exercising his discretion in a manner that the defendant did not agree with. The trial court properly allowed the other crimes evidence where defendant's prior offenses were factually similar to the charge offense, and relevant to establish defendant's propensity, as well as his criminal intent, motive, and absence of an innocent state of mind. Well, what do you attribute to counsel's argument that this primary offense on which the State elected was a violent sexual assault, and therefore, these other incidents, I guess they're not violent because they were simply touching through clothes or whatever. They weren't violent, so they should not have been allowed. What do you respond to that? We have to look at the entire context of the similarity. And here we have the defendant touching minor females with whom he had a paternal relationship in his home while he was acting as though he was doing something non-sexual. And we have to look at, part of the issue is that he had access to all of these children. They were in his home, and what happened with T.T. is, excuse me, T.T., she's 16 years old. So this is after, approximately a year after defendant gets out of jail. She's 16 years old, defendant says he's home, he's not working, and he is watching the children because of his prosthetic leg, and he's disciplining the children, and the children have a problem with that. So the context in which he goes in and this incident occurs is he claims he was simply trying to discipline her by whooping her, which he had done before both defendant and T.T. admit that he had done that repeatedly. In this instance, though, T.T. says, you know, his penis was exposed, and he wanted me to lay it across his lap. This hadn't happened before. Something was different. She knew something sexual was going on. She's 16 years old, whereas J.A. was 9, from 9 to 14, and T.M. was 12 when the incident occurred. Both of those individuals, most of the time, T.M. was asleep. The two incidents that occurred on one night with the defendant, coming in while she was asleep and touching around her vaginal area, and J.A., when she was younger, that is what happened. She testified that the defendant would come in while she was asleep. She would feel some touching, wake up, and her stepfather would be over her. So you have to look at when the defendant had access to these children and how he used that access. Isn't there a question about the years from when these acts take place? I mean, they don't happen like one day to the next, but there's actually several years that these acts supposedly take place. Well, right, you're talking about the proximity in time, and whether a defendant spent time in prison may be relevant, and you subtract that amount of time from the gap between the offenses. And the offenses that J.A. testified to— And he was in prison for what, about three years? He went into prison in about 2013, early 2013, and was released in September of 2017. His last sexual offenses, according to what J.A. testified to, were well before he went to prison. That is also when T.M. testified that he fondled her. And you have J.A. testifying, it stopped because he went to prison, and they never lived with him again after he got out of prison. T.M., the testimony is that she said something to J.A. immediately after the morning she woke up and the offenses occurred. J.A. told her, he's been doing that to me for years. And then they both went to T.M.'s family members and told them what had happened to T.M. and J.A., And the testimony is, through defendant, that T.M.'s father shot her the next day. Shot him the next day. So, when you're looking at the time period, it's a long time period for J.A. because of his access to her. The one incident with T.M. occurs right around the last incident with J.A. Basically, T.M.'s father shoots the defendant, so you can say they don't give him access to her anymore, and then he went to prison. J.A. testified, he didn't have any access to me because he went to prison and I never lived with him again. But then, about a year after he gets out of jail is when 16-year-old T.T. is in his home and he says he's trying to discipline her. They both testified that he had whooped her before, but T.T. says he never had his pants down. He never had his penis exposed. He never told me to lay across his lap. He never shut the door. So, all of these acts similar. That's... Well, what I'm saying is, defendant became more... Defendant, in all of them, was acting like he was doing something non-sexual. And the earlier incidents were younger kids, and they were asleep. With T.T., he testified at that time, after he got out of prison, he was disciplining. He had whooped her. He whooped her all the time. Family members knew about it. Even the cousin testified during the trial that he heard the defendant whooping T.T. the night before the incident, that issue here. And so, we knew there was a history. She never claimed he tried to rape her. She never called the police. She never ran away any other time that he tried to do that. But this time, he escalated it. He pulled down his pants, and he was, again, trying to pretend like he was just disciplining her. But she was 16. She knew more than the younger kids, and she knew something was wrong. This time, she really thought that he was not trying to discipline her, but he was going to try to rape her. And when she tried to run, defendant knew, oh, no, this kid knows something sexual is happening. She's going to tell somebody, and he became more aggressive. That's the difference here. And Donahoe stated that where there's initiative access to children, it can account for the differences and make the differences less significant. The similarity in the nature of the abuse is more compelling because it's a product of defendant's choice. Here, defendant wanted to act as though he was rubbing for lotion or just checking on the sleeping children when they were younger. But with Titi, she's 16, and this night, he wanted to pretend like he was just disciplining her, but he made it sexual. Titi's 16. She recognized that. An exposed penis is not what happens when you're getting whooped. Never happened before. So she tried to run. He got more aggressive. Also, defendant testified he just got in the car and went to look for her after she ran out of the house. He didn't go tell his wife, Yoko. He didn't tell his cousins who lived downstairs who he had come with him the night before when she didn't come home. Why didn't defendant try to get family members to help? Because he was trying to sexually assault her, and he didn't want them to know that. The same question I asked counsel earlier was, if you take the other crimes evidence out, didn't the state have enough here? Yes. Then why bring it in? Well, we – the state is allowed to introduce any other crimes evidence that may be admissible, and it can be considered for – it's barring any matter to what's relevant. It doesn't mean that we can't present it just because we have the testimony that she ran to her friend Kevin's house. They called the police. You have the police officer's testimony about how hysterical she was. So you do have that other testimony, so it's not just defendant and TT, but you do have that. But we're still allowed. We're still allowed to introduce that evidence because it's admissible, and it can be considered for it's bearing on any matter to which it's relevant. I also just wanted to indicate that defense counsel cited People v. Cardamale, and that was an extreme case, highly, highly distinguishable. In that case, there was testimony with a gymnastics coach, and the prosecution brought in over 257 uncharged incidents with 15 other crimes victims. It's an extreme case, completely distinguishable from this case. Let us address the continuance motion. Okay. I just want to clarify a few things before we start. The people never subpoenaed Yoko. There's no evidence, and that was not brought up in any of counsel's office. The proof, there were two days that the court heard her argument. Friday, which was the second day of trial, and counsel was able to make all her arguments. And the court said, you know what, come back on Tuesday. So she had the whole weekend, and then she came back on Tuesday with her motion for rule to show cause. Argued it. Never talked about the people had subpoenaed her. There was nothing in the record about people subpoenaing her. And she said, I relied on the people listing Yoko and Tanya as witnesses. The people said Tanya was on there just for spelling. We never intended to call them. So I just want to clarify that. I wasn't going to really necessarily add anything to the case. Yoko. Yoko. Well, Yoko, the office approved, and again, on the two different days, and then rule to show cause, they wanted to bring her in to try to impeach J.A. about whether she had told her mother, Yoko is her mother, that the defendant had been sexually abusing her. Now, and then the other thing was that she never saw anything. Well, J.A. never testified that her mother would have seen anything. She was always in a different part of the house, so that wouldn't have been impeachment. The other thing is, if Yoko were called to testify to say that T, I'm sorry, J.A. never told her the defendant was sexually abusing her, the court would also have to consider TM's testimony that the one day when the defendant did sexually abuse her, she told J.A., and J.A. told her, he's been doing that to me for years. So the court would also have to consider that. So, you know, there wouldn't be impeachment. It's also collateral. In terms of Tanya, one thing I also want to just put in terms of the forfeiture, defense counsel never argued the ruling implicated the defendant's right to present a defense. In the Office of Proof on those two different days, the motion for will to show cause, they never argued it. They said, we've got to call these witnesses. And, yeah, Yoko's okay, but we don't really need Yoko. What we really need is Tanya. But defense counsel never, ever implicated, argued that the ruling implicated his right to present a defense. Well, what is the point of an attorney asking for a witness to testify other than to present a defense? Well, they couldn't present an adequate defense without the witness. Do they have to say that? I mean, isn't that really why you call a witness, so you can present an adequate defense? Well, I mean, you don't necessarily need all the witnesses. Not every witness has the same. And some witnesses are ally witnesses, which are going to be way more important than, say, you know, another corroborating witness. So you can't just say, any time I don't get a continuance to call a witness, it implicates my constitutional right to present a defense. And here, counsel indicated that, yeah. Is it ineffective not to subpoena witnesses that you want to call? Well, forgetting the prejudice part. I mean, obviously, it was a best practice to subpoena the witnesses. And here, even if the counsel was deficient, the attorney semi-cured it by trying to have the investigator serve Yoko. But contrary to what counsel stated, in the motion to rule show cause, counsel did say that the investigator served Yoko on that Friday, the second day of trial. However, the court actually had the investigator testify. And during his testimony, the investigator said he attempted to serve Yoko by placing only the subpoena for Yoko on her arm, and she kind of batted away and kept walking. So there wasn't actually any service on Yoko, but there was an attempt. So I just want to be clear on that. Let me ask you this question. These witnesses that we're referring to right now, they were on the state's list, right? They were potential witnesses the state was going to call, right? Just to clarify, the people did say that Tyman was only on the list for spelling for the court report. Okay. But looking at Carroll's strategy, there's an inference that maybe the state realized that these people might not come in, and they may not testify as expected, and therefore, that's why they didn't put them on? I would argue that the people, as we argued in our brief, that Yoko, even if Yoko said she didn't ever see any defendant ever molest or sexually touching J.A., J.A. never said she did. It was always in another room or while her mom was sleeping or her mom was out of the house. Her mom was around, but she never said her mom would have seen it. The other thing is the court also, even if Yoko said she never told me about any abuse, we have Tyman's testimony that J.A. told her, yeah, defendant's been doing this to me for years. So I would suggest that it is an inference that the people didn't think they would show up. These are defendant's wife and daughter. So these people all know where they are now to find that. The other thing is with regard to Tanya, again, counsel told the court that they would like to call Tanya to impeach T.T. about the actual incident. And specifically, the main point they said is that she did not hear T.T. scream. However, T.T.'s testimony was, I tried to scream, but defendant had me in a chokehold, and I was losing air so I couldn't scream. So even if they called Tanya to testify she didn't hear T.T. scream, that's not impeaching. So that would be my counter to the proposition that you offer. Anything further? So just here, there would be no prejudice because even if Tanya testified that after she left the room, she didn't hear T.T. scream, that wouldn't be impeaching because T.T. said she couldn't scream because the defendant had her in a chokehold. For all these reasons and those cited in that brief, we ask this court to affirm defendant's convictions and sentences. All right. Thank you. Mr. Edwards? Brief rebuttal? Yes, thank you. Thank you, Joanna. Mostly just some factual corrections on the continuance issue. Page 376 of the court proceedings, the end of the first day of trial, the prosecutor brought to the judge three witnesses she had under subpoena for that first day that she did not call. The trial judge admonished them to be there the second day. One of them was Yoko Anderson. That's why she was present on Friday, January 17th, when, as the other correction goes ahead, the defense administrator did serve them, placed them on there, was under oath talking to the judge about that, returned them to the record on pages C-109 and 110. So she was under subpoena for that. To the extent that matters, it still was not a use of the trial judge's use of the Walker factors. He looked only at diligence and elevated that above all else and not looked at everything else. As to the propensity issue, TM testified that she was civilly detached at the end of December of 2019. Mr. Tredwell went into jail and, as he testified, January 2014, so not just before he went in. This TM incident took place a year before, if that really matters, but that's a factual thing to go ahead. Also, T.T. never testified about any other sexual thing. It seemed to be the implication in the earlier presentation that T.T. thought, this time, now this time it's going to be a sexual assault. She expressly testified that she had never been sexually assaulted, never touched anything by Mr. Tredwell. And as the state talked about in the beginning part of its presentation, for three and a half minutes, about all the facts of the other crimes evidenced, demonstrated, there was many trials on what TM said. There were many trials on what J.A. said. They elevated and took more pages of transcript and more time than on the evidence for which he was charged. And that is the prejudice, especially when we think about hundreds of generic accusations in violation of 117.73. For those reasons, on the first issue and the second issue, we ask that this Court reverse its conviction and remand for further proceedings, Your Honor. Thank you for your time. Thank you. Thank you to both sides for the arguments today. The matter will be taken under advice of the courts now, Judge.